# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs January 8, 2014

## IN RE: AIDEN W.

**Direct Appeal from the Juvenile Court for Bradley County**
**No. J-11-384      Daniel Swafford, Judge**

---

**No. E2013-01609-COA-R3-PT-FILED-APRIL 28, 2014**

---

This is a termination of parental rights case. Father's parental rights were terminated on the grounds of Tenn. Code Ann. § 36-1-113(g)(9)(A)(vi), failure to establish/exercise paternity; Tenn. Code Ann. § 36-1-113(g)(1), abandonment for willful failure to visit; Tenn. Code Ann. § 36-113(g)(2), substantial non-compliance with a permanency plan; and Tenn. Code Ann. § 36-1-113(g)(3), persistent conditions. We reverse in part and we affirm in part; we affirm the termination of Father's parental rights to Aiden W.

**Tenn. R. App. P.; Appeal as of Right; Judgment of the Juvenile Court Affirmed in Part and Reversed in Part**

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the Court, in which HOLLY M. KIRBY, J., and J. STEVEN STAFFORD, J., joined.

Wilton Marble, Cleveland, Tennessee, for the appellant, Father

Robert E. Cooper, Jr., Attorney General and Reporter, Joseph F. Whalen, Associate Solicitor General, Kathryn A. Baker, Assistant Attorney General, Nashville, Tennessee, for the appellee, State of Tennessee Department of Children's Services

## OPINION

## I. FACTS & PROCEDURAL HISTORY

This is a termination of parental rights case. In August 2011, Aiden W. was born out of wedlock to Mother and Father, who lived together. Father was present at the hospital at the child's birth, but he did not sign the child's birth certificate. The child tested positive for benzodiazepine, and three days after his birth, he was removed from the hospital and placed in foster care.

On September 7, 2011, DCS filed a Petition for Temporary Legal Custody and *Ex Parte* Order naming both Mother and Father as respondents, alleging that Aiden was dependent and neglected. A Summons was attached to the Petition summoning *Mother* to appear in the juvenile court; there was no summons attached concerning Father. Along with the Petition, DCS filed an Affidavit of Reasonable Efforts indicating that "[d]ue to the emergency nature of the case and the family not being [residents] of [Bradley] county, no services were able to be provided." On September 7, the Bradley County Juvenile Court entered a Protective Custody Order in which it found probable cause to believe that Aiden was dependent and neglected, and therefore, it awarded temporary custody of the child to the Department of Children's Services ("DCS") and it appointed a Guardian ad Litem.

A preliminary hearing was held on September 8, 2011. According to the juvenile court's Amended Preliminary Hearing Order, entered on September 27, 2011, Father did not participate in the hearing because he "did not receive notice or whereabouts unknown." The juvenile court, again, found probable cause that Aiden was dependent and neglected and it awarded temporary custody of the child to DCS. The attached Certificate of Service indicates that the order was served only on Mother and the Guardian ad Litem.

A permanency plan was entered on April 12, 2012, with a stated goal of "[r]eturn to [p]arent[.]" The plan listed the events/conditions which led to state custody as "[Mother] tested positive for benzos and opiates and Aiden tested positive for benzos. Domestic violence is also a concern." It indicated that the "emergency nature of the case and the parents not residing in this county" have prevented services from being provided. Additionally, it listed the conditions which prevented the child's exit from state custody as "[Mother's] residence can not [sic] be verified. [Mother] has been unemployed for several years and is not able to provide a stable residence for Aiden." The permanency plan listed the following "desired outcomes"[1] for Father: (1) parents will not engage in domestic

---

[1]This Court has previously criticized DCS for failing to include a section in a permanency plan

(continued...)

violence; (2) parents will be alcohol and drug free; (3) parents will have safe and stable housing; (4) parents will have reliable transportation to meet their needs and Aiden's; (5) parents will have the financial resources to meet the needs of themselves and Aiden; and (6) parents will address their mental health needs appropriately. Father did not participate in the child and family team meeting in which the permanency plan was developed, nor did he sign the permanency plan.

A second permanency plan was entered on October 26, 2012. The plan listed the same "desired outcomes[,]" but it indicated that "Mother wishes to surrender. [The Family Service Worker] has made a referral for Termination of Parental Rights." Father did not sign the second permanency plan.

An adjudicatory and permanency hearing was held on August 2, 2012. Mother stipulated that Aiden was dependent and neglected; notwithstanding, the juvenile court, in its August 23, 2012 Adjudicatory Findings and Recommendations and Permanency Hearing Order ("Adjudicatory Order"), found clear and convincing evidence that the child was dependent and neglected and it ordered that custody should remain with DCS. Additionally,

---

[1](...continued)
clearly listing a parent's responsibilities. In *In re Abigail F.K.*, No. E2012–00016–COA–R3–JV, 2012 WL 4038526, at \*13 (Tenn. Ct. App. Sept. 14, 2012), the permanency plan was "confusing" and set forth various "concerns," "desired outcomes," and "actions steps," like those in the permanency plan in this case, rather than a clear statement of responsibilities. We said:

> This omission is not a mere technicality. As we have noted in a previous case: "[T]he statute that sets out this ground for termination states that parental rights may be terminated where there is substantial noncompliance 'with the *statement of responsibilities*' in the permanency plan." *In re Askia K.B.*, 2011 WL 4634241, at \*9 (quoting Tenn. Code Ann. § 36–1–113(g)(2)) (emphasis in original). See also *State of Tenn. Dep't of Children's Servs. v. P.M.T.*, No. E2006–00057–COA–R3–PT, 2006 WL 2644373, at \*8; 2006 Tenn. App. LEXIS 608, at \*23–24 (Tenn. Ct. App. Sept. 15, 2006) ("Tenn. Code Ann. § 36–1–113(g)(2) does not require substantial compliance with a permanency plan's '[d]esired outcome[s],' rather it requires substantial compliance with a plan's statement of responsibilities"). Moreover, the statement of responsibilities serves a substantive purpose. If the parent is required to comply with the permanency plan, then the permanency plan should clearly communicate to the parent: this is what you must do to regain custody of your child. That is the purpose of the parent's statement of responsibilities. Thus, the absence of a clearly marked "statement of responsibilities" for Mother in the permanency plan is a significant problem. It is difficult for the Court to find that Mother failed to substantially comply with the plan's statement of responsibilities if the plan does not contain one.

it ratified the permanency plan submitted by DCS on April 12, 2012.[2]  In its Adjudicatory Order, the juvenile court noted that Father did not participate in the adjudicatory and permanency hearing, stating that "his current whereabouts are unknown to the Department." The attached Certificate of Service indicates that the order was served only on Mother's attorney and the Guardian ad Litem.

On September 21, 2012, DCS filed a petition to terminate the parental rights of both Mother[3] and Father to the child.  As to Father, DCS alleged the following grounds for termination: abandonment for willful failure to visit, substantial non-compliance with a permanency plan, persistent conditions, and failure to establish/exercise paternity.  Father was served with the termination petition while incarcerated in Jefferson County, and he participated in the trial held in May 2013.

At trial, Father made somewhat contradictory statements[4] regarding whether he knew Aiden was his child.  According to Father, "[w]hen [Mother] was pregnant, [he] spent every single night playing [music], singing to [his] baby."  He said, "[Mother] made the statement several times, I don't even feel like I'm carrying my son.  I feel like I'm carrying yours." When asked whether he "knew the child was [his]" prior to birth, Father responded, "Yes, sir."  However, he also testified that he "thought [Aiden] was [his], but [Mother] told [him] he wasn't."  He stated that he believed "[t]here was a small window" of possibility that the child could be his, but also that he "knew that it could be [his] child."

Despite Father's testimony that he and Mother used illegal drugs together, he testified that he was "surprised" when Aiden tested positive for drugs at birth.  Father claimed that he "didn't know [Mother] wasn't going to put [his] name on the birth certificate" and that he was not allowed to sign the birth certificate because he was "told to leave the hospital" by "hospital staff" when he and Mother began arguing after he learned that she had taken 28

---

[2]There are two phases to a dependency and neglect proceeding: "the adjudicatory phase in which the court determines whether a child is dependent and neglected pursuant to Tenn. Code Ann. § 37-1-129(a)(1), and the dispositional phase where the court 'proceed[s] immediately or at a postponed hearing to make a proper disposition of the case' under Tenn. Code Ann. § 37-1-129(c)." *In re Alysia M.S.*, No. M2011-02008-COA-R3-JV, 2013 WL 1501710, at *5 (Tenn. Ct. App. Apr. 11, 2013).  "Making a 'proper disposition' requires the court to make a custody determination 'best suited to the protection and physical, mental and moral welfare of the child.'" *Id.* (citing Tenn. Code Ann. § 37-1-130(a)).

[3]Mother's parental rights were terminated in March 2013.  The termination of her rights is not at issue on appeal.

[4]The juvenile court found Father's conflicting positions at trial regarding his knowledge of his paternity, "troubling as to [his] credibility."

oxycodone pills the night before Aiden's birth.[5]  According to Father, after learning of Mother's pill intake, he "asked the doctor to monitor [his] baby for withdrawal symptoms."

Father testified regarding his contact with DCS and with the child.  He testified that he did not receive copies of the September 7, 2011 Petition for Temporary Legal Custody and *Ex Parte* Order, the September 7, 2011 Protective Custody Order, the September 27, 2011 Amended Preliminary Hearing Order, or the August 23, 2012 Adjudicatory Order, nor did he receive notice of the hearings that precipitated those orders.  He stated that no one from DCS informed him of his right to a court-appointed attorney.

He stated that he stopped visiting the child in December 2011 "[b]ecause [he] was told [the then-foster mother] had been reprimanded for allowing [him] to visit without establishing paternity first."  He claimed that DCS did not allow him to visit the child and that he "was told [by DCS] that [he] had no rights, and that [his] mother couldn't visit and [he] couldn't visit until [he] took the DNA test."

Father then testified at length regarding his alleged efforts to prove his paternity.  According to Father, he asked for a DNA test at the hospital, but he was informed that "they didn't do it there."  Father testified that he eventually turned to DCS for help in obtaining a DNA test in December 2011.  Father acknowledged that he knew the child was removed from the hospital into DCS custody, but, at first, he testified that he had no way to contact DCS because, he contended, he had no phone number for DCS and such number is not available in the phone book or on the internet.  However, he then stated that he had "a card" with a phone number for DCS and he admitted that, apparently despite having the card, it took him approximately five months after the child's removal to phone DCS.

Father claims that in that first phone call to DCS, in December 2011, he asked DCS family service worker David Griffith for a DNA test and Mr. Griffith promised to send Father the requisite paperwork to the address of Father's mother ("Grandmother"). However, according to Father, such paperwork was never received.

Father testified that he phoned DCS again regarding a DNA test and he was told to call the child support office.  He claimed that he called the child support office and he was told that he would need an order from DCS in order to secure a DNA test.  He relayed this information to DCS and, according to Father, "[DCS] pretty much kept telling [him] to call the Services."  Father also testified that the child support office suggested he contact Legal Aid, but the wrong phone number for Legal Aid was provided, and when he eventually spoke

---

[5]According to Father, Mother had a prescription for oxycodone, but obviously she was not directed to take 28 pills in a single dose.

with someone at Legal Aid, he was told "they do not deal with that."

Father again phoned DCS in 2012 and he spoke with supervisor Charlene Lawhorn. According to Father, he explained to Ms. Lawhorn that he "had been trying to get a DNA test done, and [he] couldn't get anything done." Ms. Lawhorn questioned why he had not resolved the paternity issue earlier, and Father admittedly "got irate with her. . . . raise[d his] voice with her, and she ended up disconnecting the call."

Father was asked how long it took him to file an action to establish paternity, and he responded: "I don't even know what that means. I still don't. I'm naive today, and when I asked how to go about getting the DNA and everything, I was told to call child support, which I did." Father never filed a petition to establish paternity; however his paternity was confirmed through a DNA test in March 2013.

At the May 2013 trial, Father also testified regarding his lifestyle. He stated that he last held a job and supported himself in 2010. He admitted that he and Mother had engaged in what he described as "mutual" domestic violence. He claimed that Mother hit him with a bat, breaking his collarbone, and that he "reacted to her several times[.]"

He admitted that he had a drug problem both before and after Aiden's birth and that the problem "ha[d] persisted for many years." He testified that he and Mother used and sold illegal drugs together. Father agreed that from Christmas 2011 "until just recently," he was using drugs, living on the street,[6] and was unable to function as a parent. He admitted that as of January 2012, he was "in active addiction . . . [and] homeless in the street[,]" he "was in no condition to take care of [him]self[,]" and he did not keep DCS informed of his address or phone number. He stated that after Aiden's removal, he "stayed in motels for the first month maybe, maybe two" which he paid for by selling drugs, that he then "started sleeping in the woods[,]" and that he then "rented a shed from somebody[.]" He claimed that although the person from whom he rented the shed owned a telephone, he could not find the phone number for DCS. He also claimed that he sent no letters to DCS because he did not know the address and that he did not ask his mother to send a letter because he "wasn't thinking rationally[.]" He testified that during his homelessness, he had friends inform his mother of his whereabouts, but he admitted that he never asked those friends to update DCS as to his location. He claimed that he last used drugs in October 2012, and that he last sold

---

[6]Father testified that he was living on the street from January 2012 until he entered rehab. At the time of trial, Father was living in a long-term rehabilitation center in Shelbyville as a condition of violating the terms of community corrections. From the record, we cannot discern when he entered the facility; however, Father does not argue that his enrollment hindered visitation, and therefore, we presume that he was not in rehab between May and September 2012.

drugs four to seven months prior to his last usage.

Father testified that he is currently living in Shelbyville, Tennessee, at a long-term rehabilitation center where he is receiving "[d]rug and mental rehabilitation." Father is housed at the facility until February 19, 2014, as an alternative to jail after violating "community corrections[.]"[7] Father claimed that he is "[b]ipolar and ADHD[,]" but he testified that "[f]or the first time in [his] life [he is] being medicated for [his] mental disorder" rather than "self-medicat[ing]." Father testified that upon his exit from rehab he plans to live with his mother in Sevier County. He stated that he has applied for Social Security disability and that he has "signed up for college" to become an "HVAC specialist." He claimed that he is "making some drastic life changes, and [that he] actually ha[s] a positive outlook in [his] life."

Grandmother testified that she reached out to DCS on numerous occasions seeking visitation and a DNA test and offering to pay for such, but that either her calls went unreturned or she was informed that she had no rights to the child. She claimed that she tried to file a petition for custody, but that she could not do so because she did not know the child's location. She stated that Father has not lived with her since Aiden's birth, and that although she was not always apprised of his location, that she could always contact him. Grandmother testified, "Nothing was mailed to my address at any point in time[,]" and that she did not learn that court action had been taken until the termination petition was filed. She stated, "Had [she] received something, [she] could have contacted [Father] and got it to them. And I repeatedly made Ms. Lawhorn aware of that fact, that I could reach him, because we're close and even when he was struggling we still maintained contact." She stated that despite her repeated efforts to become involved in the case, DCS first initiated contact with her nineteen months into the case.

Leann Smith, who acted as the DCS case manager on Aiden's case beginning in February 2012, also testified. Ms. Smith stated that when she took over the case, she had no way to contact Father. She had been told "that he might be living with his mother or living here or there. Nothing definite." She testified that she contacted Grandmother, but that Grandmother was unable to put her in contact with Father.

Father eventually did call Ms. Smith, a single time, in April of 2012. Father asked Ms. Smith how he could establish paternity, and she explained that he would need to take a DNA test. She offered to call Child Support Services for him and then to return his call. Father did not provide an address because he informed Ms. Smith "that he was headed to

---

[7]The record does not indicate the type/s of criminal activity in which Father was involved. Similarly, it contains no information regarding any prior arrests or convictions.

Mississippi or Georgia. Him [sic] and his friend had a million dollar business they were going to do. It was to buy waste from factories, change it into energy, and sell the energy back to the factories." Ms. Smith did, however, save the phone number from which Father called, but when she tried to return his call, she "got a message saying there were no minutes or the number had been disconnected." Ms. Smith then contacted Grandmother, but Grandmother indicated that she only spoke with Father "every once in a while" and that she did not know his whereabouts. According to Ms. Smith, Grandmother phoned Ms. Smith in May 2012 asking for a DNA test, but Grandmother, again, did not know Father's whereabouts.

Ms. Smith stated that Father did not know the exact location of the foster parents' home, as that information was sealed, because "Mother's attorney stated that [Father] was very violent[.]" However, Ms. Smith testified, "I hadn't been informed that he couldn't visit. When I talked to him, he didn't ask for visitation. And when I tried through other sources like [Mother] or his mother, I was not able to get able to get any kind of contact information to actually get in touch with him."

During her trial testimony, DCS case manager Leann Smith stated that during her single discussion with Father, she did not "go into the permanency plan and explain the requirements to him[.]" Ms. Smith believed she would be able to explain the requirements to Father at a later time, but Father's phone became inoperative. She testified that "[*i*]*f* [she had] been able to contact [Father], he would have been invited to [the child and family team meetings], and there we would have reviewed what was on the plan." (emphasis added). Ms. Smith did not inform Father of his right to a court-appointed attorney, that he could sign the putative father's registry, that he could execute a sworn acknowledgment of paternity, or that hearings were scheduled in the case.

DCS Family Service Worker David Griffith, who worked on Aiden's case from September 2011 to February 2012, also testified at the termination trial. He did not know why Father had stopped visiting the child in December 2011. He never met Father, but spoke with him on one occasion in December 2011, which he described as follows:

> Well, the conversation with [Father] was basically this, that he was interested in getting custody of his son. So we discussed what he needed to do. And during that time period, I needed his address, his contact number information, put that all in my notes, and basically stated that he also need[ed] DNA testing, to go and comply with that, and what his requirements were to help him get his son back. . . . He informed me, then, that at that time he had a possible waste products job that he was supposed to be going to in Mississippi and/or Louisiana, and I just said keep me in contact.

Mr. Griffith told Father that DCS did not perform DNA testing, but he "gave him a source for DNA[.]" Mr. Griffith gave Father his telephone number and he advised Father of the importance of maintaining contact, but Father was unable to provide Mr. Griffith with any contact information due to his plans to travel to Mississippi or Louisiana. Mr. Griffith "[could not] say for sure" whether he explained Father's permanency plan to him. He testified that he "just basically [went] over in general what he needs to do as a parent, provide stability, provide a job, the basic things." He could not remember telling Father that he needed mental health or anger management counseling, or that he needed to enter drug rehab. Mr. Griffith did not tell Father that he had the right to a court-appointed attorney.

Finally, Aiden's current foster parents testified at the termination trial. Aiden had lived with them since September 2012; however, the parents had provided respite for the former foster parents, and therefore, they had known Aiden since he was two weeks old. They testified that Aiden is "doing wonderful" in their home, that he is bonded to them and to their other children, and that he refers to them as "mama and dada[.]" They indicated their "absolute" desire to adopt Aiden. They stated that Father has never attempted to contact them or to provide anything for Aiden, and that Aiden has no relationship with Father.

On July 10, 2013, the juvenile court entered a Termination of Parental Rights Order which terminated Father's parental rights on all grounds alleged by DCS, specifically: Tenn. Code Ann. § 36-1-113(g)(9)(A)(vi), failure to establish/exercise paternity; Tenn. Code Ann. § 36-1-113(g)(1), abandonment for willful failure to visit; Tenn. Code Ann. § 36-1-113(g)(2), substantial non-compliance with a permanency plan; and Tenn. Code Ann. § 36-1-113(g)(3), persistent conditions. Father timely appealed.

## II. ISSUES PRESENTED

Father presents the following issues for review, as restated:

1.  Whether the trial court erred in terminating Father's parental rights for abandonment for willful failure to visit;

2.  Whether the trial court erred in terminating Father's parental rights for substantial non-compliance with a permanency plan;

3.  Whether the trial court erred in terminating Father's parental rights for persistent conditions;

4.  Whether the State made reasonable efforts; and

-9-

5.      Whether the portion of Tenn. Code Ann. § 36-1-113(g)(9)(A)(vi) that allows for the termination of a father's parental rights based upon his failure to file a petition to establish paternity within thirty (30) days of notice from the mother is unconstitutional.

Additionally, the State of Tennessee, Department of Children's Services presents the following issue:

1.      Whether the trial court correctly concluded that clear and convincing evidence supported the finding that it was in the child's best interests for Father's parental rights to be terminated.

For the following reasons, we reverse in part and we affirm in part; we affirm the termination of Father's parental rights to Aiden W.

### III.   STANDARD OF REVIEW

"A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the Due Process Clause of the federal and state constitutions." *In re J.C.D.*, 254 S.W.3d 432, 437 (Tenn. Ct. App. 2007); *In re Audrey S.*, 182 S.W.3d 838, 860 (Tenn. Ct. App. 2005). Although the parent's right is fundamental and superior to the claims of other persons and the government, it is not absolute. *In re J.C.D.*, 254 S.W.3d at 437. A parent's right "continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination." *Id.*; *see also In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).

In Tennessee, proceedings to terminate a parent's parental rights are governed by statute. "Parties who have standing to seek the termination of a biological parent's parental rights must prove two things." *In re Audrey S.*, 182 S.W.3d at 860; *see also In re M.J.B.*, 140 S.W.3d at 653. First, they must prove the existence of at least one of the statutory grounds for termination, which are listed in Tennessee Code Annotated section 36-1-113(g). *Id.* Several grounds for termination are listed in subsection (g), but the existence of any one of the grounds enumerated in the statute will support a decision to terminate parental rights. *In re S.R.C.*, 156 S.W.3d 26, 28 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). Second, the petitioner must prove that terminating parental rights is in the child's best interest, considering, among other things, the factors listed in Tennessee Code Annotated section 36-1-113(i). *In re Audrey S.*, 182 S.W.3d at 860. Because no civil action carries graver consequences than a petition to sever family ties forever, both of the elements for termination must be proven by clear and convincing evidence. *Id.* at 860-61. In sum, "[t]o terminate parental rights, a trial court must determine by clear and convincing

-10-

evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest." ***In re F.R.R., III***, 193 S.W.3d 528, 530 (Tenn. 2006) (citing *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). Clear and convincing evidence has been defined as evidence that "eliminates any serious or substantial doubt concerning the correctness of the conclusion to be drawn from the evidence." ***In re L.J.C.***, 124 S.W.3d 609, 619 (Tenn. Ct. App. 2003) (quoting *In the Matter of: C.D.B., S.S.B., & S.E.B.*, 37 S.W.3d 925, 927 (Tenn. Ct. App. 2000)). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. ***In re Audrey S.***, 182 S.W.3d at 861.

Because of this heightened burden of proof in parental termination cases, on appeal we must adapt our customary standard of review as set forth in Tennessee Rule of Appellate Procedure 13(d). ***In re Audrey S.***, 182 S.W.3d at 861. First, we review each of the trial court's specific factual findings *de novo* in accordance with Rule 13(d), presuming the finding to be correct unless the evidence preponderates against it. ***Id.*** Second, we must determine whether the facts (either as found by the trial court or as supported by the preponderance of the evidence) clearly and convincingly establish the elements required to terminate parental rights. ***Id.*** Whether a statutory ground has been proven by the requisite standard of evidence is a question of law to be reviewed *de novo* with no presumption of correctness. ***In re R.L.F.***, 278 S.W.3d 305, 312 (Tenn. Ct. App. 2008) (citing *In re B.T.*, No. M2007-01607-COA-R3-PT, 2008 WL 276012, at *2 (Tenn. Ct. App. Jan. 31, 2008)).

## IV. DISCUSSION

### A. Grounds for Termination

#### 1. Abandonment for Willful Failure to Visit

The first ground for termination listed in the statute, and the one most frequently relied upon, is abandonment. ***In re Audrey S.***, 182 S.W.3d at 862. For purposes of terminating parental rights, there are five alternative definitions of abandonment listed in Tennessee Code Annotated section 36-1-102(1)(A)(I)-(v). The definition relevant in this case provides that "abandonment" means that:

(I) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s)[8] or guardian(s) of the child who is the subject of the petition for

---

[8]Tenn. Code Ann. § 36-1-102 provides that "'Parent(s)' means any *biological*, legal, adoptive
(continued...)

termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child[.]

Abandonment can be established by showing that a parent either willfully failed to visit or willfully failed to provide support. *See In re Audrey S.*, 182 S.W.3d at 863 ("In the statutes governing the termination of parental rights . . . . [w]illful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent.") (citations omitted). "Failure to visit or support a child is 'willful' when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *Id.* at 864 (footnote and citations omitted). "Whether a parent failed to visit or support a child is a question of fact. Whether a parent's failure to visit or support constitutes willful abandonment, however, is a question of law." *In re Mark A.L.*, No. M2013-00737-COA-R3-PT, 2013 WL 5536801, at *3 (Tenn. Ct. App. Oct. 4, 2013) (citing *In re Adoption of Angela* E., 402 S.W.3d 636, 639 (Tenn. 2013)).

In this case, the termination petition was filed on September 21, 2012; thus, the relevant four-month period extends from May 21, 2012 to September 21, 2012. At trial, Father admitted that he has "seen [his] son three times in his whole life" and that he last saw the child in December 2011 when he was approximately five months old. Father concedes that he failed to visit the child during the relevant four-month period, but he argues that his failure cannot be classified as *willful* because, he claims, the State hid the child in foster care and denied him visitation until a DNA test could prove his paternity.[9]

In its order terminating Father's parental rights, the juvenile court made the following findings related to abandonment for failure to visit:

1. [Father] testified that he has only visited with the child three times, despite being present at the child's birth and aware that the child was taken into foster care after the child was removed from the hospital. He demonstrated an ability to contact the Department, despite his testimony that he did not know how to reach the Department, as he also testified regarding two phone calls he made to the Department. Additionally, the foster care workers acknowledged having spoken with him on at least two occasions.

---

[8](...continued)
parent(s) or, for purposes of §§ 36-1-127 -- 36-1-141, stepparents[.]" (emphasis added).

[9]Father does not argue that he was unaware of his duty to visit.

2. [Father] testified that his last visitation with the child was in December 2011, nine months prior to the filing of the State's Petition for Termination on September 21, 2012. [Father] testified a DCS caseworker was reprimanded for allowing him visits before he established paternity; however, he did not testify that he was denied any specific requests for visitation that he sought with the Department. [Father] testified that he was homeless, drug addicted and living from place to place on the streets. He acknowledged at times th[a]t [his] own mother did not know his whereabouts and that he never lived with her during this time.

3. [Father] testified that he was denied visitation because he had not established paternity. A review of the Bradley County Juvenile Court file and the exhibits shows that a no-contact order was never entered against [Father], nor any other conditions placed on his ability to visit with the child. Simply, he did not seek visitation, because by his own testimony he was unstable both physically and mentally, and strung out on drugs.

4. Even if the Court or Department had placed a restriction upon [Father] to establish paternity prior to obtaining visitation [with] the child, [Father] would have been left with an ability to cure the issue that kept him from obtaining visitation, by seeking to establish paternity of the child, which he did not.

5. [Father] asserted the child's foster parents were hidden from the father and [Grandmother], in an attempt to evade the father or keep him from having contact with this child. [Father] acknowledges that he was fully aware that his child was taken into foster care and despite his testimony that he could not find the contact information in the phonebook for the Department, he demonstrated twice that he was able to call Dave Griffith and LeAnn Smith. He failed to keep in contact with the Department, despite being free and able to call and he failed to provide reliable contact information to the Department to allow the workers to keep him informed of developments in the case.

6. [Grandmother] testified that she provided her address to the Department, but never received any communications from the Department; however, she also testified that she never entered an appearance in the underlying dependency and neglect action as intervening petitioner. She also testified that her son never resided with her during the entirety of the time the child has resided in foster care.

"Failure to visit a child is 'willful' when a parent is aware of his or her duty to visit, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." **In re Mark A.L.**, No. M2013-00737-COA-R3-PT, 2013 WL 5586801, at *6 (Tenn. Ct. App. Oct. 4, 2013) (citing *In re Adoption of Angela E.*, 402 S.W.3d at 639) *see also In re Audrey S.*, 182 S.W.3d at 863 ("In the statutes governing the termination of parental rights, 'willfulness' does not require the same standard of culpability as is required by the penal code. Nor does it require malevolence or ill will. Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent.") (citations omitted). "'A parent who attempted to visit and maintain relations with his child, but was thwarted by the acts of others and circumstances beyond his control, did not willfully abandon his child.'" **Id.** (quoting *In re Swanson*, 2 S.W.3d 180, 189 (Tenn. 1999)).

As a prerequisite to a proceeding to terminate on the ground of abandonment, the Tennessee legislature has established statutory requirements for the type of notice that must be given to a parent when the child has been placed in foster care. *In re J.L.E.*, No. M2004-02133-COA-R3-PT, 2005 WL 1541862 (Tenn. Ct. App. M.S. filed June 30, 2005). The required notice varies depending on the extent of the parent's participation in the formation of the permanency plan. The *In re J.L.E.* Court recently summarized these statutory notice provisions and the rationale for them, stating as follows:

> Tennessee Code Annotated section § 37-2-403 establishes requirements for a permanency plan for a child placed in foster care. It also establishes requirements for notice to parents of the definition and potential consequences of "abandonment" as that term is defined in Tenn. Code Ann. § 36-1-102. First, that definition and the potential and procedures for termination of parental rights are to be included in the initial permanency plan itself, which is to be signed by the parent. Tenn. Code Ann. § 37-2-403(a)(2)(A). Second, at the hearing on the court's consideration of the permanency plan, the court "shall explain on the record the law relating to abandonment contained in § 36-1-102." Tenn. Code Ann. § 37-2-403(a)(2)(B)(I). If the parents are not present at the first hearing, the court is to make the required explanation at any subsequent hearings. *Id.*

*In re J.L.E.*, 2005 WL 1541862, at *7 (footnote omitted). If the parents do not appear at permanency plan hearings or cannot be provided notice of such hearings, DCS may still proceed to terminate parental rights on the ground of abandonment when the child or children have been placed in foster care "under

-14-

§ 36-1-102" *only if* DCS demonstrates specified things at the time of the termination proceeding. *Id.*; Tenn. Code Ann. § 37-2-403(a)(2)(B)(ii). Those showings are:

> (a) That the court record shows, or the petitioning party presents to the court a copy of the permanency plan [] that shows that the defendant parents or legal guardians, subsequent to the court review in subdivision (a)(2)(B)(I), has signed the portion of the permanency plan [] [that] describes the criteria for establishing abandonment under § 36-1-102, or that the court record shows that, at a subsequent hearing regarding the child, the court made the statements to the parents or legal guardians required by subdivision (a)(2)(B)(I)[;]
>
> (b) By an affidavit, that the child's permanency plan [] containing language [that] describes the criteria for establishing abandonment under § 36-1-102 was presented by the agency party to the parents or guardians at any time prior to filing the termination petition, or that there was an attempt at any time to present the plan [that] describes the criteria for establishing abandonment under § 36-1-102 to the parents or guardians at any time by the agency party, and that such attempt was refused by the parents or guardians[; and]
>
> (c) That, *if the court record does not contain a signed copy of the permanency plan*[], or if the petitioning agency cannot present evidence of a permanency plan [] showing evidence of such notice having been given or an affidavit showing that the plan was given or that the plan was attempted to be given to the parents or guardians by the agency and was refused by the parents or guardians, and in this circumstance, *if there is no other court record of the explanation by the court of the consequences of abandonment and the right to seek an attorney at any time, then the petitioning agency shall file with the court an affidavit in the termination proceeding* [*that*] *describes in detail the party's diligent efforts to bring such notice required by subdivision (a)(2)(B)(I) to such parent or guardian at any time prior to* [] *the agency's filing of the termination petition.*

Tenn. Code Ann. § 37-2-403(a)(2)(B)(ii) (emphasis added); *In re J.L.E.*, 2005

-15-

WL 1541862, at *7-8; see also *State Dep't of Children's Services v. K.W.C.*, No. E2007-00307-COA-R3-PT, 2007 WL 2198593, at *9-10 (Tenn. Ct. App. E.S. filed Aug. 1, 2007). "The notice provisions of the statute are designed to inform parents, before they engage in conduct constituting abandonment, of the potential consequences of that conduct. Otherwise, it has no real purpose." *In re J.L.E.*, 2005 WL 1541862, *9.

***In re B.L.C.***, No. M2007-01011-COA-R3-PT, 2007 WL 4322068, at *4-5 (Tenn. Ct. App. Dec. 6, 2007) (reversing the termination of a mother's parental rights on the ground of abandonment because DCS failed to provide the mother with the statutory notice required by Tenn. Code Ann. § 37-2-403(a)(2)).

We find that in this case, DCS failed to prove by clear and convincing evidence that the statutory notice requirements were met regarding its efforts to notify Father. The record indicates that Father did not participate in the case until the termination petition was filed; he did not receive notice of the criteria for establishing abandonment via a signed permanency plan or in-court statements, nor did he refuse a parenting plan which contained the requisite criteria. Accordingly, DCS was required to file an affidavit describing its "diligent efforts" to provide Father with the notice required by subdivision (a)(2)(B)(I) prior to the filing of its termination petition. The record contains no such affidavit.[10] Because DCS failed to provide Father with the statutory notice required by Tenn. Code Ann. § 37-2-403(a)(2), we conclude that the trial court erred in terminating his parental rights on the ground of abandonment.

### 2. Substantial Non-Compliance with a Permanency Plan

Parental rights may be terminated upon finding clear and convincing evidence that "[t]here has been substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan[.]" **Tenn. Code Ann. § 36-1-113(g)(2)**. "Terminating parental rights based on Tenn. Code Ann. § 36-1-113(g)(2) requires more proof than that a parent has not complied with every jot and tittle of the permanency plan." ***In re M.J.B.***, 140 S.W.3d at 656. Rather, "[t]o succeed under Tenn. Code Ann. § 36-1-113(g)(2), the Department must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place, and second that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular

---

[10]The only affidavit in the record before us is an Affidavit of Reasonable Efforts filed contemporaneously with the Petition for Temporary Legal Custody and *Ex Parte* Order. It makes only a single reference to Father–an allegation of domestic violence between him and Mother.

-16-

requirement that has not been met." *Id.* (citations omitted). "Substantial noncompliance is a question of law which we review de novo with no presumption of correctness." *In re Valentine*, 79 S.W.3d 539, 548 (Tenn. 2002).

As set out above, two permanency plans were entered in this case, requiring the following of Father: (1) parents will not engage in domestic violence; (2) parents will be alcohol and drug free; (3) parents will have safe and stable housing; (4) parents will have reliable transportation to meet their need and Aiden's; (5) parents will have the financial resources to meet the needs of themselves and Aiden; and (6) parents will address their mental health needs appropriately.

On appeal, Father argues that the juvenile court erred in terminating his parental rights on the ground of substantial non-compliance with the permanency plans because, he claims, his responsibilities under the plans were never explained to him.

At trial, Father testified that he had never seen either of the permanency plans entered in this case and he seemed to indicate that he was unaware that any permanency plans even existed as to him. The permanency plans were introduced into evidence and they do not contain Father's signatures and they do not contain any indication that Father participated in any child and family team meetings. Similarly, there is nothing in the record to indicate that Father received notice of the plans or any hearings related thereto.

During her trial testimony, DCS case manager Leann Smith stated that during her single discussion with Father, she did not "go into the permanency plan and explain the requirements to him[.]" Ms. Smith believed she would be able to explain the requirements to Father at a later time, but Father's phone was not operative. She testified that "[*i*]*f* [she had] been able to contact [Father], he would have been invited to [the child and family team meetings], and there we would have reviewed what was on the plan." (emphasis added).

DCS family service worker David Griffith "[could not] say for sure" whether he explained Father's permanency plan to him. He testified that he "just basically [went] over in general what he needs to do as a parent, provide stability, provide a job, the basic things." He could not remember telling Father that he needed mental health or anger management counseling, or that he needed to enter drug rehab.

In its order terminating Father's parental rights, the juvenile court found that Father had not been fully apprised of the permanency plans' requirements; however, it found that "[b]ecause of the father's transient lifestyle, his responsibilities under the plan could not be fully explained and effectively rendering it impossible for the Department to facilitate reunification or assist [Father] on the steps of his permanency plan." It found that Father had

failed to substantially comply with the permanency plan, as follows:

> [Father] failed to obtain stable housing or legal income. He failed to obtain a mental health evaluation until he was placed into a Court Ordered treatment facility after the State's Petition for Termination had been filed. He violated the terms of his community corrections, causing him to be incarcerated. He failed to maintain visitation with the child; failed to keep in contact with the Department; and failed to ever establish paternity.

> Tennessee Code Annotated section 37-2-403(a)(2)(c) provides in relevant part:

> Substantial noncompliance by the parent with the statement of responsibilities provides grounds for termination of parental rights, notwithstanding other statutory provisions for termination of parental rights, and notwithstanding the failure of the parent to sign or to agree to such statement *if the court finds the parent was informed of its contents*, and that the requirements of the statement are reasonable and are related to remedying the conditions that necessitate foster care placement.

(emphasis added). In this case, it is clear that Father was never informed of the contents of the permanency plans. It is axiomatic that he could not have complied with requirements of which he was unaware. Accordingly, we must find that the trial court erred in terminating Father's parental rights on this ground. ***See generally In re M.M.M.***, No. W2009-00909-COA-R3-PT, 2009 WL 4505435, at *7 (Tenn. Ct. App. Dec. 4, 2009) (declining, under section 37-2-403(a)(2)(c), to consider whether the mother complied with the requirements of a permanency plan of which she did not receive a copy).

### 3. Persistent Conditions

In addition to abandonment and substantial non-compliance with a permanency plan, the juvenile court found that DCS had established by clear and convincing evidence the ground for termination commonly referred to as "persistent conditions" which is set forth in Tennessee Code Annotated section 36-1-113(g)(3)(A)-(C):

> (3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) moths and:

> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care

of the parent(s) or guardian(s), still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminished the child's chances of early integration into a safe, stable and permanent home[.]

The juvenile court's findings on this ground are as follows:

1. The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months; and the conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist; there is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and the continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

2. At the time of the removal in 2011, [Father] and the mother . . . were abusing illegal drugs and [Father] was selling illegal drugs. The child was removed from the hospital, preventing the child from returning to the home where the mother and [Father] resided together. The Department alleged that the parents exposed the child to illegal drug use and domestic violence.

3. It has been twenty months since the child was placed into foster care in September 2011, and the conditions that led to the State's removal of the child persist. [Father] testified that he last used illegal drugs six months ago. He testified that he violated the terms of his community corrections and was ordered to attend a drug and mental health rehabilitation center and has been in the program for approximately six weeks at the time of trial. The Tony Rice Center, where [Father] is residing, is in Shelbyville, Tennessee, and he will continue to reside in that program until February 2014. He is unable to assume care and custody of the child and is obtaining ongoing treatment for mental health diagnoses and drug addiction.

4. It is unknown whether [Father] will remain compliant with his mental health treatment and maintain sobriety outside the rehabilitation center. Past conduct is the best indication of probable future conduct.

5. There is no likelihood that [Father] will be released from the rehabilitation center any sooner than February 2014, and there is no guarantee that upon his release that he will be in a position to assume custody of the child as he will still need to obtain a residence and employment; maintain sobriety; and maintain compliance with his mental health routine.

6. Requiring the child to remain in foster care pending [Father's] release from his facility diminishes the child's chances of being placed into a safe and stable, permanent home, and will require the child to linger in foster care unnecessarily.

7. [Father] acknowledged in his testimony that his drug problem has persisted for many years; that he self-medicated with illegal drugs instead of obtaining mental health treatment sooner; and that he has not had legal employment since 2010.

In cases involving the "persistence of conditions" ground, DCS is not required to prove that a parent-child relationship cannot be salvaged, nor is DCS required to show that a parent is "currently harmful" to a child's safety or future emotional stability. *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at \*5 (Tenn. Ct. App. July 21, 2000). "The question herein is the likelihood that the child can be safely returned to the custody of the [parent], not whether the child can safely remain in foster care with weekly visits with the [parent]." *Id.* The termination of parental rights statutes recognize a child's need for a permanent, stable environment. *Id.* A parent's continued inability to provide fundamental care to a child, even if not willful, whether caused by a mental illness, mental impairment, or some other cause, constitutes a condition which prevents the safe return of the child to the parent's care. *In re T.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at \*7 (Tenn. Ct. App. July 13, 2000). Where efforts to provide help to improve parenting abilities have been offered over a long period of time and have proved ineffective, "the conclusion that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." *Id.* The purpose behind the "persistence of conditions" ground for terminating parental rights is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at \*9 (Tenn. Ct. App. Mar. 3, 2008).

"The success of a parent's remedial efforts generally depends on the Department's assistance and support." *In re Giorgianna H.*, 205 S.W.3d at 518 (citing *In re C.M.M.*, No. M2003–01122–COA–R3–PT, 2004 WL 438326, at *7 (Tenn. Ct. App. Mar.9, 2004)). As a result, in order to establish this ground for termination, "the Department must not only establish each of the elements in Tenn. Code Ann. § 36–1–113(g)(3)(A), it must also establish by clear and convincing evidence that it made reasonable efforts to reunite the family and that these efforts were to no avail." *Id.* (citing *In re C.M.M.*, 2004 WL 438326, at *7 n. 27, *8).

On appeal, Father does not challenges the trial court's finding that the conditions which led to the child's removal persist. Instead, he argues that the ground of persistent conditions cannot be proven because "there is no valid order adjudicating that the child was dependent and neglected with respect to [Father]" because Father did not receive prior notice of the adjudicatory hearing or even a copy of the order after its entry. Additionally, he argues that DCS failed to make reasonable efforts to assist him in remedying the conditions.

We first address Father's argument related to the validity of the order removing Aiden. As set out above, a finding of persistent conditions requires, among other things, that "[t]he child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months[.]" **Tenn. Code Ann. § 36-1-113(g)(3)**. Again, on appeal, Husband argues that this requirement has not been met because he did not receive prior notice of the adjudicatory hearing nor did he receive a copy of the Adjudicatory Order after its entry.

In *In re Audrey S.*, 182 S.W.3d at 874, the middle section of this Court explained that a predicate "order of a court" under section 36-1-113(g)(3) results from "a judicial finding of dependency, neglect, or abuse." Here, the trial court entered its Adjudicatory Order, to which both Father and Mother were named as respondents, finding by clear and convincing evidence that the child was dependent and neglected. Although Father apparently did not receive prior notice of the hearing or the resulting order, the trial court expressly found that Father had "fail[ed] to cooperate or stay in contact with the Department. . . . and his current whereabouts are unknown[.]" Accordingly, we find the Adjudicatory Order constitutes a valid predicate order for purposes of termination on the ground of persistent conditions.

In our analysis of the persistent conditions issue, we next address whether DCS made reasonable efforts. Under certain circumstances, DCS has a statutory obligation to use "reasonable efforts" to preserve, repair, and restore a parent-child relationship when DCS intervenes in family matters. *In re Bernard T.*, 319 S.W.3d 586, 599-600 (Tenn. 2010). "Because of the importance of family relationships, the Tennessee General Assembly has recognized that children should not be separated from their parents unless the separation is

necessary for the children's welfare or is in the interests of public safety." *Id.* at 600 (citing Tenn. Code Ann. § 37-1-101(a)(3); Tenn. Code Ann. § 37–2–401(a)). Thus, when circumstances do require that children be separated from their parents, DCS may be required to "use reasonable efforts to make it 'possible for the child to return safely to the child's home.'" *Id.* (citing Tenn. Code Ann. § 37-1-166(a)(2), (g)(2)).

DCS' duty to make reasonable efforts includes an obligation to exercise "'reasonable care and diligence . . . to provide services related to meeting the needs of the child and the family.'" *In re Steven P.D.*, 2012 WL 3025151, at *9 (quoting Tenn. Code Ann. § 37-166(g)(1)). In considering DCS's efforts, the courts consider the following factors:

> (1) the reasons for separating the parents from their children, (2) the parents' physical and mental abilities, (3) the resources available to the parents, (4) the parents' efforts to remedy the conditions that required the removal of the children, (5) the resources available to the Department, (6) the duration and extent of the parents' efforts to address the problems that caused the children's removal, and (7) the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and the Department's efforts.

*Id.* at *10 (quoting *In re Giorgianna H.*, 205 S.W.3d at 519). "Courts should decide the reasonableness of DCS's efforts 'on a case-by-case basis in light of the unique facts of the case.'" *Id.* (quoting *In re Bernard T.*, 319 S.W.3d at 601). DCS must prove, by clear and convincing evidence, that its efforts were reasonable. *Id.* (citing *In re B.B.*, No. M2003-01234-COA-R3-PT, 2004 WL 1283983, at *9 (Tenn. Ct. App. June 9, 2004)).

> The exercise of reasonable efforts is important because "[t]he success of a parent's remedial efforts generally depends on the Department's assistance and support." *In re Giorgianna H.*, 205 S.W.3d at 518 (citations omitted). DCS employees must affirmatively and reasonably utilize their education and training to help parents eliminate the conditions requiring removal of their children and to meet the responsibilities of their permanency plans before courts will terminate the parent-child relationship. *In re R.L.F.*, 278 S.W.3d at 316 (citations omitted). DCS's duty to affirmatively assist parents exists even if the parents do not seek assistance. *Id.* (citing *In re C.M.M.*, 2004 WL 438326, at *7). "While the Department's reunification efforts need not be 'herculean,' the Department must do more than simply provide the parents with a list of services and send them on their way." *In re Giorgianna H.*, 205 S.W.3d at 519 (citation omitted).

The legislature, however, did not place the burden to reunify parent and child on DCS's shoulders alone. *See State, Dep't of Children's Servs. v. Estes*, 284 S.W.3d 790, 801 (Tenn. Ct. App. 2008) (citation omitted). Reunification "is a two-way street, and neither law nor policy requires the Department to accomplish reunification on its own without the assistance of the parents." *In re Tiffany B.*, 228 S.W.3d at 159 (citations omitted). "Parents share the responsibility for addressing the conditions that led to the removal of their children from their custody." *Id.* Once services have been made available, parents must make reasonable efforts to rehabilitate themselves. *Id.* (citations omitted).

*Id.*

In this case, the juvenile court made the following findings regarding DCS' efforts:

> The Court concludes the State has proven by clear and convincing evidence they have made reasonable efforts to reunify the parent with the child.

> (Reaching this conclusion has been difficult and as a consequence the Court wishes to explain its analysis.[)] The State must make reasonable efforts to return the child to the parent's care and custody or prove that such efforts would have been futile under the circumstances. The child must be returned safely to the child's home and DCS employees have an affirmative duty to use their education and training.

> In this case, the Court would have preferred to see a greater effort and diligence on the part of DCS; however, the remedial responsibility does not rest solely on the Department's shoulders. DCS did do more than simply providing [Father] with a list of service providers and sending him on his way. In light of the Respondent's chronic instability, drug involvement, untreated mental health issues, and criminal activity, the Court believes even more efforts would have been futile under the circumstances. In addition, [Father] made odd and inconsistent statements as to where he was and what happened between the removal of the child and the filing of a termination, which gives the Court concern as to his credibility. In looking at the overall efforts by DCS, the Court finds the effort adequate. [Father] argues DCS should have made more aggressive efforts to contact and/or place with a relative, his mother. The grandmother neither participated in the Dependency and Neglect proceedings nor filed a custody petition despite testifying she stayed in almost

constant contact with DCS following the removal. She testified she was told she could not file for custody. She also said she talked with an attorney but could not afford to retain one. [Father] and his mother testified he was in contact with his mother on a regular basis and she could reach him at anytime, or at least knew where he was living. However, [Father] testified at another point someone had stolen his phone and that he stayed in contact with his mother by having friends call her. When asked how he could maintain contact with his mother on a consistent basis but did not contact DCS, [Father] answered he could not find the telephone number of DCS. . . .

(emphasis in original).

The juvenile court then made the following relevant findings of fact related to the reasonableness of DCS' efforts:

[Father] testified that he did not keep in contact with the Department following December 2011. He testified that he was living on the streets, from place to place, sometimes without a phone. He stated during these times he was in active addiction and in no condition to take care of himself. He states that he kept in contact with his mother . . . by occasionally calling her or having friends call to tell his mother that he was okay. He testified that he has had a drug problem for [] many years and predating the child's birth.

The Department's workers, LeAnn Smith and David Griffith, testified that during this period of time from December 2011 until present, they were unable to maintain contact with [Father]; did not have current contact information for him; and could not reach him.

. . . .

The Department developed permanency plans for the child[]. [Father] did not attend the meetings where the permanency plans were drafted.

. . . .

Dave Griffith testified that he was responsible for the child's case from the time he entered foster care until February 2012. Mr. Griffith testified that during that time he had one conversation with [Father], during which [Father] stated that he wished to regain custody of the child. Mr. Griffith stated that he went over some of the basic requirements of the permanency plan and advised

[Father] that he would need to establish paternity of the child. Mr. Griffith testified that he was unable to maintain contact with [Father] following that phone call, because [Father] failed to provide a good phone number or an address where [Father] could be reached.

. . . .

LeAnn Smith testified that she took over the responsibility for Aiden's case management in February 2012. She testified that at the time that she received the case, she did not have a way to contact [Father]. She stated that she contacted [Father's] mother . . . in an effort to reach him, but that she was unable to provide contact information for [Father], as well.

LeAnn Smith stated that her first contact with [Father] was in April 2012 when he called her. She testified that she was in another meeting and left the room to take his call. She stated that he advised her that he was moving to Mississippi or Georgia and that he and his friend had a million dollar business they were pursuing. She testified that she saved the number that he was calling from so that she would have a way to contact him back. When [Father] questioned her about a DNA test Mrs. Smith advised [Father] that she would contact Child Support Services to attempt to schedule the DNA test and would return his call. Mrs. Smith testified that she was never able to reach [Fahter] again as his phone had been disconnected. She stated that she did not have an opportunity to review the permanency plan or obtain more information as she thought that they would remain in contact after that call. [Father] never called Mrs. Smith again.

[Father] testified that during the child's custodial episode he was living from place to place, continuing to sell drugs, did not maintain the same contact information, and at times his own mother was unaware of where he was living. He testified to living in a shack behind someone's home and moving from motel to motel. [Father] was without a permanent address during this time. [Grandmother] testified that at no time did [Father] reside with her. [Father] was eventually incarcerated in Jefferson County, Tennessee and then transferred to a rehabilitation center, where he now resides.

(emphasis in original).

In sum, the juvenile court pointed out the following efforts which had been exerted by DCS: Mr. Griffith spoke with Father on one occasion and he relayed to Father "some of

the basic requirements of the permanency plan and advised [Father] that he would need to establish paternity of the child[;]" Ms. Smith spoke with Father during a Father-initiated phone call and she advised him to contact Child Support Services for a DNA test; Ms. Smith left a voice mail with Child Support Services; and Ms. Smith phoned Grandmother on one occasion. However, the trial court appeared to base its finding of reasonable efforts primarily upon Father's transient lifestyle and DCS' subsequent inability to locate Father such that it could provide additional services to him.

"The reasonableness of DCS's efforts depends upon the circumstances of a particular case." *In re Zeylon T.S.*, E2011-00287-COA-R3-PT, 2011 WL 5052957, at *10 (Tenn. Ct. App. W.S. Oct. 24, 2011) (citing *In re Tiffany B.*, 228 S.W.3d at 158). As this Court has stated, "DCS cannot be expected to work miracles in the face of [] dogged resistance to being assisted." *Id.* In this case, Father's transient lifestyle essentially prevented DCS from providing him with services related to his issues with drug abuse, mental illness, domestic violence, housing, transportation and unemployment. The record demonstrates that DCS attempted to make contact with Father on several occasions but was unable to do so because Father admittedly failed to keep DCS informed of his address or telephone number while he was living on the streets addicted to drugs. DCS cannot be expected to provide services to a parent who chooses to remain unreachable.

In sum, we find that DCS exerted reasonable efforts under the circumstances of this case. Because the conditions which led to the child's removal admittedly persist, we affirm the trial court's termination of Father's parental rights on this ground.

### 4. Failure to Establish Paternity

The final ground on which Father's parental rights were terminated is found in Tennessee Code Annotated section 36-1-113(g)(9)(A)(vi), which provides:

(9)(A) The parental rights of any person who, at the time of the filing of a petition to terminate the parental rights of such person . . . is not the legal parent[11] or guardian of such child or who is described in § 36-1-117(b) or (c)

---

[11]"Legal parent" is defined as:
(A) The biological mother of a child;
(B) A man who is or has been married to the biological mother of the child if the child was born during the marriage or within three hundred (300) days after the marriage was terminated for any reason, or if the child was born after a decree of separation was entered by a court;
(C) A man who attempted to marry the biological mother of the child before the child's birth

(continued...)

may also be terminated based upon any one (1) or more of the following additional grounds:

(I) The person has failed, without good cause or excuse, to pay a reasonable share of prenatal, natal, and postnatal expenses involving the birth of the child in accordance with the person's financial means promptly upon the person's receipt of notice of the child's impending birth;

(ii) The person has failed, without good cause or excuse, to make reasonable and consistent payments for the support of the child in accordance with the child support guidelines promulgated by the department pursuant to § 36-5-101;

(iii) The person has failed to seek reasonable visitation with the child, and if visitation has been granted, has failed to visit altogether, or has engaged in only token visitation, as defined in § 36-1-102(1)(c);

(iv) The person has failed to manifest an ability and willingness to assume legal and physical custody of the child;

(v) Placing custody of the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child; or

(vi) *The person has failed to file a petition to establish paternity of the child*

---

[11](...continued)
by a marriage apparently in compliance with the law, even if the marriage is declared invalid, if the child was born during the attempted marriage or within three hundred (300) days after the termination of the attempted marriage for any reason;
(D) A man who has been adjudicated to be the legal father of the child by any court or administrative body of this state or any other state or territory or foreign country or who has signed, pursuant to §§ 24-7-113, 68-3-203(g), 68-3-302 or 68-3-305(b), an unrevoked and sworn acknowledgment of paternity under the provisions of Tennessee law, or who has signed such a sworn acknowledgment pursuant to the law of any other state, territory or foreign country;
(E) An adoptive parent of a child or adult; or
(F) A man shall not be a legal parent of a child based solely on blood, genetic, or DNA testing determining that he is the biological parent of the child without either a court order or voluntary acknowledgment of paternity pursuant to § 24-7-113. Such test may provide a basis for an order establishing paternity by a court of competent jurisdiction, pursuant to the requirements of § 24-7-112[.]

*within thirty (30) days after notice[12] of alleged paternity by the child's mother, or as required in § 36-2-318(j), or after making a claim of paternity pursuant to § 36-1-117(c)(3)*[.]

(emphasis added).

On appeal, Father concedes that he is a biological, non-legal parent and that he failed to file a petition to establish paternity within thirty days after Mother notified him of his alleged paternity. However, he presents a due process challenge to the statute under Article I, Section 8, of the Tennessee Constitution.[13] Having affirmed the termination of Father's parental rights on the ground of persistent conditions, however, we decline to address Father's constitutional argument because resolution of this issue is not necessary to decide the case. ***See In re Taylor B.W.***, 397 S.W.3d 105, 114 (Tenn. 2013) (citing *State v. Taylor*, 70 S.W.3d 717, 720 (Tenn. 2002)).

## B. Best Interest of the Child

Father has not raised on appeal the issue of whether termination of his parental rights was in Aiden's best interest, and he offers no argument against the trial court's finding in this regard. The State, however, has properly raised the issue "because having found a ground for termination of parental rights, a trial court is required to consider, as we must on review, whether termination of those rights is in the child's best interest." *In re Michaela V.*, No. E2013-00500-COA-R3-PT, 2013 WL 6096367, at *11 (Tenn. Ct. App. Nov. 19, 2013) (citing Tenn. Code Ann. § 36-1-113(I); *In re Audrey S.*, 182 S.W.3d at 877).

---

[12]The statute further provides that:

(i) For purposes of this subdivision (g)(9), "notice" means the mailing, postage pre-paid, or the sending by, express mail, courier, or other conveyance, to the person charged with notice at such person's address a statement that such person is believed to be the biological parent of a child. Notice shall be deemed received if the statement sent is not returned undelivered or evidence is not otherwise received by the sender that the statement was not delivered; and

(ii) "Notice" also means the oral statement to an alleged biological father from a biological mother that the alleged biological father is believed to be the biological father of the biological mother's child[.]

**Tenn. Code Ann. § 36-1-113(g)(9)(B)**.

[13]Father challenges only the portion of 36-1-113(g)(9)(B)(vi) which provides for the termination of parental rights for failure to establish paternity within thirty days of notice of alleged paternity by the mother.

In evaluating the child's best interest, we are to consider numerous factors including, but not limited to, those set forth in Tennessee Code Annotated section 36-1-113(I):

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parents or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

In its Termination of Parental Rights Order, the juvenile court made express findings regarding the best interest factors, as follows:

[Father] has not established a relationship with the child. Due to his failure to visit the child regularly, there is no meaningful relationship that exists between the child and [Father]. He responded to the question as to why the termination should not go forward by saying when the mom was pregnant he sang to the baby and played music for the baby.

[Father] has failed to make changes in his conduct or circumstances that would make it safe for the child to go home. He is currently residing in a treatment facility pursuant to Court Order to receive treatment for drug addiction and mental illness. He will remain in the facility, unable to assume custody of the child until at least February 2014.

The Court finds that it is in the best interest of the child for termination to be granted as to [Father] because changing caregivers in this stage of his life would have a detrimental effect on him. He is bonded to his foster family and siblings and he has had a significant relationship with the [foster] family since he was two weeks old. LeAnn Smith testified the child is doing very well in the foster home. The [foster] family is willing to adopt the child should he become eligible for adoption, in an effort to provide him a safe and stable permanent home to which the child has already adjusted fully and feels safe and accepted.

A child's future must take precedence over unremedied persistent conditions. In this case, [Father], at the time of trial, is beginning to address some of the issues that brought the child into custody; however, Aiden deserves to integrate into a permanent home as soon as possible, as he has remained in foster care since September 2011.

[Father] has testified to his wish for the child to leave his current foster home to live with [Grandmother] until such a time when he can exit the rehabilitation center and return to [Grandmother's] home and eventually obtain his own home. This scenario would have the child leave a home where he is most comfortable to live with a stranger, waiting again for [Father] to continue to remedy his mental health, drug, and criminal issues in a Court Ordered rehabilitation center.

The Court fears [Father] may return to his life of instability, crime and substance abuse after leaving the rehabilitation center.

**(V1, 50-51)**. The trial court's best interest determination is a conclusion of law which we review *de novo* with no presumption of correctness. *In re Z.V.S.P.*, No. M2009-00058-COA-R3-PT, 2009 WL 1910919, at *17 (Tenn. Ct. App. July 1, 2009) (citing Tenn. R. Civ. P. 13(d)).

At the time of the termination hearing, Aiden was nearly two years told, yet Father acknowledged that he had only "seen [his] son three times in his whole life"–the last time when Aiden was approximately five months old. Father accepted responsibility for Aiden having spent practically his entire life in foster care, and he acknowledged that he suffered from mental illness and had a long history of drug abuse. Father testified that he had not held a legal job since 2010 and that he had been unable to function as a parent since at least late-2011. He conceded that he would be unable to take custody of Aiden until at least February 2014–approximately nine months after the trial–due to his detention in rehab as a result of his violation of probation. Additionally, at no time did Father establish paternity of Aiden.

At the time of trial, Aiden had been in his current foster home for approximately nine months, the foster parents had been involved in his life since he was two weeks old, and the foster parents testified that they "absolutely" wished to adopt him. The foster parents testified that Aiden is doing well in their home; he is developing appropriately and is very bonded to them and to their other children. They stated that Aiden refers to them as "mama" and "dada." DCS case manager Leann Smith likewise testified that Aiden is thriving in his current placement and that he is "very bonded" to his foster family.

Based upon the foregoing, we conclude that there is clear and convincing evidence to support the trial court's finding that termination of Father's parental rights is in the best interest of Aiden.

## V. CONCLUSION

For the aforementioned reasons, we reverse in part and we affirm in part; we affirm the termination of Father's parental rights to Aiden W. Costs of this appeal are taxed to Appellant, Father, and his surety, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.